# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

MARKET STREET SECURITIES, on behalf of itself and all others similarly situated,

Plaintiff,

v.

MIDWEST AIR GROUP, INC., TIMOTHY E. HOEKSEMA, FREDERICK P. STRATTON, JR., SAMUEL K. SKINNER, JOHN F. BERGSTROM, DAVID H. TREITEL, RICHARD H. SONNENTAG, ULICE PAYNE, JR., JAMES R. BORIS and ELIZABETH T. SOLBERG,

Defendants.

C.A. No. _____

COMPLAINT

Plaintiff, by its counsel, alleges upon personal knowledge as to plaintiff's own acts and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1.      This is a shareholder class action seeking injunctive and other forms of relief, including damages if appropriate, with regard to the proposal, first made on or about October 20, 2006, publicly announced on or about December 13, 2006, increased on January 11, 2007, and subsequently increased on April 2, 2007, by AirTran Holdings, Inc, ("AirTran") to acquire Midwest Air Group, Inc., ("Midwest" or the "Company").  Plaintiff alleges Midwest's Board of Directors (the "Board") breached its duties of due care and good faith owed to the Company's public stockholders by rejecting multiple offers from AirTran (absent any diligent or objective investigation and absent any agreement to discuss or negotiate such offers with AirTran)  to combine the two companies.  Plaintiff seeks injunctive relief to require the Board to fulfill its fiduciary duties to the stockholders by compelling it, among other things, to adequately consider the pending proposal from AirTran, engage in good faith negotiations with AirTran

regarding possible terms for a combination, and take all necessary steps to maximize short-term and long-term shareholder value. The public stockholders of Midwest have been, and continue to be, deprived of the opportunity to realize fully the benefits of their investment in the Company. Plaintiff further seeks an order directing defendants to either eliminate the Company's anti-takeover devices (the "Rights Plan") or an order directing the Board to employ the Rights Plan only in a manner calculated to maximize shareholder value, not as means to entrench itself. Moreover, this action seeks, where appropriate, compensatory damages. Finally, the action seeks an order directing defendants to fully disclose all internal information that the Board relied upon in rejecting AirTran's multiple exchange offers (as detailed below) and that defendants were obligated to disclose.

2.      Plaintiff, by its attorneys, alleges upon information and belief (said information and belief being based, in part, upon the investigation conducted by and through its undersigned counsel), except with respect to its ownership of Midwest common stock, and its suitability to serve as a class representative, which is alleged upon its own knowledge, as follows:

## PARTIES AND NON-DEFENDANT ENTITIES

3.      Plaintiff Market Street Securities is, and at all relevant times has been, the owner of shares of defendant Midwest.

4.      Defendant Midwest is a corporation organized and existing under the laws of the State of Wisconsin. Midwest maintains its principal offices in this judicial district at 6744 South Howell Avenue, Oak Creek, Wisconsin 53154. Midwest, through its subsidiaries, provides scheduled passenger service in the United States and internationally. It offers scheduled passenger service to destinations in the United States and regional scheduled passenger service to cities primarily in the Midwest and to Toronto, Ontario, Canada. The

/465412

company also provides aircraft charter services, transport air freight and mail, and provides other airline services.

5. Defendant Timothy E. Hoeksema has been Chairman of the Board, President and Chief Executive Officer of the Company since 1983. He has been a director of the Company since 1983.

6. Defendant Samuel Skinner is currently "Of Counsel" to Greenberg Traurig, LLP, and has been a director of the Company since 1998.

7. Defendant Elizabeth T. Solberg is an independent consultant and has been a director of the Company since 2001.

8. Defendant Richard H. Sonnentag has been the managing partner of Cobham Group LP (investment partnership) since 1994, and has been a director of the Company since 1997. He previously served as a director of Midwest Airlines from 1983 to 1990.

9. Defendant John F. Bergstrom has served as Chairman and Chief Executive Officer of Bergstrom Corporation (automobile sales and leasing) since 1974, and has been a director of the Company since 1993.

10. Defendant Frederick P. Stratton, Jr., is Chairman Emeritus of Briggs & Stratton Corporation (engine manufacturing), and has been a director of the Company since 1998.

11. Defendant Ulice Payne, Jr., is President of Addison-Clifton, LLC (provider of global trade compliance advisory services), and has been a director of the Company since 1998.

/465412

12.     Defendant David H. Treitel has served as Chairman and Chief Executive Officer of SH&E, Inc. (aviation consulting) since 1996, and has been a director of the Company since 1984.

13.     Defendant James R. Boris has been a director of the Company since 2006.

14.     The foregoing individual directors of Midwest (collectively the "Director Defendants"), owe fiduciary duties to Midwest and its shareholders.

15.     The average tenure of the Director Defendants is approximately 14 years, with some members having served nearly a quarter of a century.  In December 2006 (according to information contained in an open letter to Midwest's stockholders dated February 1, 2007), Midwest's Board voted for but failed to disclose that each director's annual retainer fee was increased by 60%, increased by 100% the fee each director will receive attending meetings, and provided a $500 fee for every telephonic meeting directors attend.

16.     AirTran, through its wholly owned subsidiary, AirTran Airways, Inc., provides scheduled air transportation services in the United States. It offers scheduled airline service primarily in short-haul markets in the eastern United States, with flights originating and terminating at its hub in Atlanta, Georgia.  AirTran maintains its headquarters at 9955 AirTran Boulevard, Orlando, Florida 32827.  AirTran is not a party in this action.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs.

18.     This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

/465412

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(a)(1) because one or more defendants, including defendant Midwest, either resides or maintains offices in this District, and a substantial portion of the alleged wrongdoing occurred in this District.  Moreover, defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have had an effect in this District.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of all shareholders of defendant Midwest (except defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the defendants) or their successors in interest, who have been or will be adversely affected by the conduct of defendants alleged herein (the "Class").

21.     This action is properly maintainable as a class action for the following reasons:

a.      The class of shareholders for whose benefit this action is brought is so numerous that joinder of all class members is impracticable.  As of as of January 31, 2007, there were 24,027,070 shares of defendant Midwest common stock outstanding owned by thousands of shareholders of record scattered throughout the United States.

b.      There are questions of law and fact which are common to members of the Class and which predominate over any questions affecting any individual members.  The common questions include, *inter alia*, the following:

i.      whether the Company's outright rejection of AirTran's multiple exchange offers is unfair to the Class and a violation of its fiduciary duties;

ii.      whether plaintiff and the other members of the Class would be irreparably damaged by the Board's refusal to engage in further negotiations with AirTran;

iii.      whether defendants breached their fiduciary and other common law duties owed by them to plaintiff and the other members of the Class;

iv.      whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by defendants;

v.      whether the Company's Rights Plan is inappropriate *per se*; and,

vi.      whether defendants are using the Rights Plan or threatening to use it in a manner that is inconsistent with their fiduciary responsibilities.

22.      Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. The claims of plaintiff are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

23.      Plaintiff anticipates that there will not be any difficulty in the management of this litigation.

24.      For the reasons stated herein, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## SUBSTANTIVE ALLEGATIONS

25.      On February 21, 2006, Midwest "adopted an updated shareholder rights plan intended to protect the rights and interests of the company's shareholders."  Midwest also stated that the updated Rights Plan was "not a response to any specific attempt to acquire the company."  This statement was misleading.  As detailed below, AirTran approached Midwest in

2005 regarding a proposed combination of the two companies before the updated Rights Plan was enacted.

26. On October 20, 2006, AirTran made an offer to Midwest's Board to acquire all the outstanding shares of Midwest in a transaction valued at $290 million. Under the terms of the proposed transaction, each share of Midwest would be exchanged for cash and AirTran stock, collectively valued at $11.25 per share and representing a 37 percent premium to the thirty-day average closing price and an 89 percent premium to the six-month average closing price for Midwest's common stock, prior to October 20, 2006, the date the offer was made.

27. On December 13, 2006, AirTran revealed that on December 7, 2006, it was informed that "the Midwest board had declined AirTran's merger offer, determined not to consider AirTran's proposal further and intended to remain independent."

28. AirTran also revealed in an open letter to the Board that, "we have been trying to privately negotiate a merger between our separate companies for some time. More than a year ago, you declined our initial proposal to acquire Midwest Air Group…."

29. Furthermore, AirTran offered that its management "would welcome the opportunity to consider non-public information concerning Midwest and are prepared to sit down and enter into serious discussions and, following that, consider in our offer any enhanced values that may be demonstrated. We are also willing to afford representatives of Midwest the opportunity to review non-public information about AirTran Airways and are prepared to enter into an appropriate confidentiality agreement to that end."

30. According to AirTran, the following are among the benefits of the proposed transaction:

/465412

a. creates a low fare carrier with greater scale and substantial fleet commonality that is better positioned to face the pressures of an increasingly competitive domestic airline environment, including the near certainty of industry consolidation;

b. generates greater efficiencies for both companies, with unit cost for the combined carrier, on a non-fuel basis and stage length adjust basis, 12 percent lower than current Midwest levels;

c. offers Midwest a larger, more modern fleet with enhanced prospects of long-term revenue and profit growth;

d. combines complementary route networks with limited overlap to form a stronger, more efficient airline with 1,036 daily departures with 173 unique nonstop markets between 74 cities across the U.S.;

e. increases the growth potential of both companies through the expansion of the Milwaukee hub, building Kansas City into a focus city and continued expansion of the Atlanta hub both into markets served by Midwest and with the addition of new cities;

f. generates estimated synergies of more than $60 million per year; improves job security for both companies' employees, offering a merger partner with a strong commitment to continuing the employment of employees of both companies with increased employment, traffic and taxable revenue expected in key cities like Milwaukee, Kansas City, Atlanta and Orlando; and

g. brings together compatible, entrepreneurial cultures rooted in consumer value, efficiency and cost consciousness.

31. On January 10, 2007, Midwest issued a press release announcing a strategy purportedly designed to "to maximize shareholder value as a stand-alone company."

Defendant Timothy E. Hoeksema, chairman and chief executive officer, stated that, "we remain committed to maximizing shareholder value and continuing to provide the superior customer service that our passengers deserve."

32.     However, *Bloomberg News* reported that Jim Corridore, a Standard & Poor's analyst said that, "this news is an additional attempt to discourage the AirTran merger offer.  [The new strategy] looks like not much more than its normal business plan."

33.     An AirTran spokesperson told the Associated Press that, "we would have thought they would come to us with some questions or some discussion.  It's a pretty complex offer, and it's got a lot of nuts and bolts in it and you'd think they would come back and ask us for clarifications.  But all they've said is 'no'.  *We just wish they'd engage us in discussions*." (Emphasis added).

34.     According to *TheStreet.com,* AirTran Chairman and CEO Joe Leonard stated in a conference call, "we wanted to work with management, but quite frankly, we've been stonewalled for over a year now."

35.     In response to Midwest's repeated refusal to discuss the proposed transaction, on January 11, 2007, AirTran announced that it "commenced an exchange offer for all of the outstanding shares of Midwest Air Group for $13.25 per Midwest share, based on the closing price of AirTran common stock on January 8, 2007.  The offer consist[ed] of $6.625 in cash and 0.5884 shares of AirTran common stock for each Midwest share. The total equity value of the exchange offer [was] $345 million.  The offer [ . . .] represent[ed] a premium of 61 percent over the thirty day average closing price of Midwest common stock at the time of AirTran's initial proposal to acquire all of Midwest's common stock at a price of $11.25 per share on

/465412

October 20, 2006, and an approximately 46 percent premium over the closing price the day prior to December 13, 2006, the date on which AirTran disclosed its October 20, 2006, offer."

36.     The exchange offer was originally scheduled to expire at 12:00 midnight, New York City time, on February 8, 2007, unless extended.

37.     AirTran Chairman and CEO Joe Leonard stated that, "while we would have wished to enter into negotiations with Midwest's Board and management to consummate a definitive merger agreement, it is clear that they had no intention of doing so. Largely due to the overwhelming support we have received for the combination from Midwest shareholders, employees, customers and the communities Midwest serves, after the disclosure of our October 20th proposal, we decided to bring our offer directly to Midwest's investors."

38.     AirTran provided an extensive presentation to Midwest's shareholders during a conference call on the same day.  The presentation noted that Milwaukee travelers currently pay over 40% more than similar markets for their airline seats, and also described Milwaukee's relative lack of airline service.   In stark contrast, the presentation noted the numerous benefits to Midwest's shareholders, employees, and the Milwaukee community associated with AirTran's exchange offer:

a.      combined airline will create a stronger and more flexible competitor:  (i) upper Midwest hub complements AirTran's east coast presence; (ii) combined network strengthens position in key markets; and (iii) amid industry consolidation, scale will provide competitive advantage;

b.      growth can be accomplished with benefits for all Midwest stakeholders: (i) shareholders receive significant premium and stock in new company; (ii) employees realize increased growth opportunities and job security; (iii) customers gain access to

extended flight network; and (iv) communities benefit from increased jobs and presence of larger carrier; and

   c. improved profit opportunities through numerous revenue and cost synergies.

  39. On January 18, 2007, AirTran announced the results of its review of Midwest's strategy to "to maximize shareholder value as a stand-alone company."  In short, AirTran concluded as follows: "The plan is essentially status quo and relies on older aircraft and outsourced regional jets, both expensive to operate and not well-suited for low-cost competition. The vulnerability of the Midwest Airlines' stand-alone plan is that its success is heavily dependent on a benign competitive environment, maintaining significant fare premiums and favorable fuel costs.  While these conditions may arise from time to time, they are unlikely to be sustainable."

  40. Wall Street analysts confirmed AirTran's conclusions:

   a. Kevin Crissey, with UBS Investment Research, wrote, "[w]e tend to agree with AirTran's critical assessment of Midwest's longer-term potential.  Growing using regional jets is not particularly compelling and Midwest lacks an industry leading cost structure to really pursue the low fare model.  In our view, Midwest is a well-liked, niche carrier with a second tier hub and few competitive advantages to allow for significant growth."

   b. Ray Neidl, with Calyon Securities, wrote, "We believe a merger would make sense, given the two companies' route networks are complementary with limited overlap, and combines AirTran's strong East Coast presence with Midwest's hubs in Milwaukee and Kansas City.  There is also a strong fleet commonality between the carriers that creates significant cost synergies."

c.    Helane Becker with The Benchmark Company wrote, "We believe it would be difficult, however for [Midwest] to match the synergies that a merger with another airline would create."

41.    On January 19, 2007, AirTran announced that it sent a letter directly to Midwest's shareholders the previous day describing its negotiations with Midwest and appealing directly to Midwest's shareholders.  In pertinent part, AirTran's letter stated the following:

> For several months, AirTran has tried to engage Midwest management in discussions concerning the merits of combining the two companies and the benefits it would bring to all Midwest stakeholders. ***Midwest's Board and management have, however, declined our requests to explore such a combination***. Even after December 13th, when we made our proposal of October 20, 2006 public, the reply was that the "ball was in our court". As we saw it, the next step was to bring our offer directly to you, so that you, the owners of Midwest, would have the opportunity to act in your own financial interests. We have now done so.

(Emphasis added).

42.    On January 23, 2007, AirTran again announced ***additional*** Midwest-related efforts to deny any possible combination of the two companies.  "[T]he management of Midwest . . . is attempting to thwart AirTran from communicating directly with the Midwest shareholders about its offer to merge the two airlines by refusing to comply with a New York State Law (Section 1315 of the Business Corporation Law), which requires Midwest to release its shareholder list to AirTran."

43.    AirTran's press release also detailed additional commentary – an increasingly common refrain among industry experts: "a well respected airline financial analyst from Calyon Securities commented, 'We believe Midwest faces an uncertain future as a stand-alone carrier' noting its years of losses and its limited ability to modernize and expand and the

serious threat posed by an 'invigorated Northwest Airlines' refocusing its attention on Milwaukee."

44.     On January 24, 2007, AirTran issued another letter to Midwest's shareholders describing the benefits associated with a combination of the two companies. "[T]he AirTran Airways proposal addresses each of these issues and provides the revenue diversity, cost structure, aircraft *and other benefits that Midwest, its constituents in Milwaukee and Kansas City, its employees and most important, you, the shareholder need and deserve*. We believe the combination of AirTran and Midwest will create a highly efficient airline with a broad national network and quality product that can compete with any airline." (Emphasis added).

45.     On January 25, 2007, pursuant to Securities and Exchange Commission ("SEC") regulations, Midwest responded to AirTran's January 11, 2007, exchange offer and announced its unanimous recommendation that Midwest's shareholders reject AirTran's offer.

46.     Midwest's Schedule 14D-9, filed in connection with its recommendation, detailed the negotiations (or lack thereof) between Midwest and AirTran, as well as Midwest's purported review of AirTran's exchange offer.

47.     The 14D-9 noted that in December 2006, the Board approved amendments to certain severance agreements "to conform to the requirements of Section 409A of the Code." In addition, the Board approved several amendments to the agreements.

48.     The 14D-9 also disclosed the identity of Midwest's consulting agency retained in connection with Midwest's "shareholder maximizing" plan. Constituting a clear conflict of interest, Midwest retained defendant Treitel's *own company in this role*: "On November 10, 2006, Midwest retained Simat, Helliesin & Eichner, Inc., a leading global aviation consulting firm ("SH&E"), to assist it in connection with, among other things, an evaluation of

/465412

elements of Midwest's strategic business plan. SH&E completed its services in December 2006. SH&E was paid a fee of approximately $100,000 for such services and was reimbursed for its out-of-pocket expenses. ***Mr. David H. Treitel, a member of the Board and Chairman of the board affairs and governance committee of the Board, has been the Chairman and Chief Executive Officer and a shareholder of SH&E since 1996.*** Mr. Treitel was not involved in the negotiation of the terms of the engagement or in providing services to Midwest in connection with the engagement." (Emphasis added).

49. The press release, however, did not state that defendant Treitel would not financially benefit from Midwest's retention of his consulting firm.

50. Finally, Midwest did not invalidate or otherwise make inapplicable its Rights Plan – a pre-condition to the consummation of AirTran's exchange offer.

51. Conspicuously absent from Midwest's 14D-9 was any discussion of negotiations with AirTran regarding either the possibility of increased consideration or the possibility of additional explanation regarding AirTran's pending exchange offer. Furthermore, Midwest's 14D-9 acknowledged that AirTran advised Midwest on October 23, 2006, that its "earlier indication of interest was based on publicly available information" only.

52. In short, the 14D-9 failed to detail important information concerning why the Board declined to engage in a meaningful dialogue with AirTran, and why it refused to consider affording AirTran access to Midwest's proprietary information, business plans, and other confidential information. This type of information is generally made available to a good faith offeror by the target in an effort to solicit an even higher bid once a substantial offer has been made. In fact, AirTran's Chairman/CEO made this fact clear in an October 23, 2006, letter to defendant Hoeksema (attached as Exhibit 99.4 to AirTran's December 13, 2006, Form 425

14

filed with the SEC) when he noted the following: "I do want to make it clear that our offer was based on publicly available information. As we discussed, I am fully prepared to assign staff to meet with your representatives to identify additional value that would be recognized in an enhanced offer."

53. After Midwest's outright rejection of AirTran's exchange offer, AirTran issued a press release stating, in pertinent part, as follows: "Despite the benefits that a combined AirTran and Midwest would bring to our respective shareholders, employees and the greater Milwaukee community, Midwest has continued to decline to meet with us to negotiate an agreement . . . We believe that the Midwest Board and management have been negligent in meeting their fiduciary obligations to the Midwest shareholders, and we urge the company's owners to tender their shares to let the Board and management of Midwest know that they want Midwest to explore the merits of the merger. . . With today's demands that corporate governance be of the highest caliber, strictly adhering to the best interests of shareholders, we are surprised that Midwest's Board would act in such a precipitous manner and again decline to evaluate our offer without even discussing it with us. . . ."

54. On February 1, 2007, AirTran announced that it would extend its pending exchange offer, originally due to expire on February 8, 2007, until March 8, 2007. AirTran's decision to extend the exchange offer was premised upon Midwest's refusal "to allow the company to communicate directly with shareholders" forcing AirTran to "go to Court to enable it to do so."

55. On the same day, AirTran sent yet another letter to Midwest's shareholders in response to Midwest's recommendation against AirTran's exchange offer.

AirTran's letter outlined deficiencies in Midwest's stand-alone plan, and proposed a new direction for Midwest's Board. In pertinent part, AirTran's letter stated the following:

        a.     AirTran "believes that those charged with fiduciary obligations are more concerned about their own positions than permitting the owners of Midwest to accept AirTran's offer";

        b.     "if Midwest's management is so confident about it's [sic] 'stay-the-course, go-it-alone plan,' it should provide a level playing field for its shareholder to fairly consider AirTran's proposal";

        c.     AirTran has laid out in detail how its plan will create many more jobs in the Milwaukee region than Midwest now provides; and

        d.     AirTran "will be nominating three individuals for election to the Board of Directors of Midwest at the next annual meeting of stockholders . . . Jeff Erickson, Charles Kalmbach and John Albertine – [who] will help restore high standards and strong corporate governance at your company."

       56.     On February 19, 2007, AirTran's Chairman/CEO Leonard sent another letter to Midwest's board of directors requesting a firm annual meeting date to allow Midwest shareholders to vote on AirTran's proposed directors. Mr. Leonard's letter also again detailed the myriad synergies between the two companies, and asked Midwest to "create an unfiltered forum for [it] to hear from [its] owners."

       57.     Midwest responded several days later in a letter stating the following: "We continue to believe that your offer is inadequate, and that Midwest shareholders should reject the offer and not tender their shares for the reasons outlined in our Jan. 25 14D-9 filing."

/465412

58. On February 23, 2007, AirTran filed an amendment to its Schedule TO-T which described many of the benefits associated with an Air-Tran/Midwest combination. AirTran specifically noted the following benefits:

a. Increase service by over 50% to 215 flights per day by Summer 2009;

    i. Additional 50 jet departures.

    ii. More than double seat capacity.

    iii. Improve Intra-Wisconsin service.

    iv. Nonstop destinations grows to 70.

b. 1,100 new WI based employees, with added payroll of $30 million;

c. Expansion will create nearly $1 billion in economic benefit to Wisconsin; and

d. Training facilities, call center, aircraft maintenance, marketing services center in Milwaukee area.

59. In fact, Midwest's true reasons for repeatedly rebuffing AirTran's efforts to discuss a possible transaction with Midwest were revealed on February 27, 2007, in an article from the Associated Press. Specifically, Midwest's CEO: (i) "said he fears that if his company is joined with the low-cost carrier it would lose its charm"; (ii) Midwest would have to "giv[e] up perks such as Midwest's trademark chocolate chip cookies"; and (iii) convert Midwest into "a high-density, low-cost product[.]"

60. On March 7, 2007, Midwest announced that it submitted preliminary proxy materials to the SEC pursuant to its previously announced intent to elect John Albertine, Jeffrey Erickson, and Charles Kalmbach to fill positions on Midwest's board of directors at

Midwest's next annual meeting of shareholders. On the same day, AirTran extended the deadline for a second time for Midwest shareholders to accept its bid.

61.     In connection with its preliminary proxy materials, AirTran's CEO stated the following: "By electing these nominees, Midwest shareholders would be electing directors who are committed to acting in the shareholders' best interests and to keeping the Board's focus on maximizing shareholder value . . . The election of these three nominees would send a strong signal that the company's 'stay-the-course,' 'business-as-usual-strategy' – multi-year losses, less service, fewer jobs, and lower wages for employees – is unacceptable.  It says that, by continuing along that path, the Company is placing its employees, customers and communities, as well as its shareholders, at risk to the competitive pressures that are already threatening Midwest."

62.     On March 25, 2007, the CEO of Octavian Master Funds, L.P., one of Midwest's 5% shareholders, sent a letter to Midwest which stated, in pertinent part, the following:

> Octavian believes that a combined Midwest-AirTran could offer a remarkable opportunity to combine the management teams of two of the best run airlines in the country, achieve significant efficiencies, and stimulate more traffic and business in Milwaukee and other core markets. Importantly, as part of a larger company, Midwest would be less susceptible to and better able to deal with the very real threat of new competitive entrants into Milwaukee and would have the benefit of much greater stability in a volatile industry.
>
> In the event AirTran were to materially increase its offer for Midwest Airlines to a level more reflective of the company's value, we would strongly encourage and expect the board and management team of Midwest to abide by their fiduciary duties and immediately enter into good faith negotiations to effectuate a transaction. We believe that many other shareholders would share that expectation. In the event of a combination, we would also strongly encourage the AirTran board and management to adopt best practices for the combined Midwest-AirTran, including incorporating many of the unique features of Midwest's product,

services and brand that have been developed over the last two decades.

63. On March 30, 2007, Midwest announced that the company set May 23, 2007, as the date of its Annual Meeting of Shareholders. In addition, the board set April 9, 2007, as the record date for the annual meeting.

64. On April 2, 2007, AirTran announced that it increased its offer to purchase all of the outstanding shares of Midwest to $15.00 per Midwest share, based on the closing price of AirTran common stock on March 30, 2007. Specifically, the revised offer consists of $9.00 in cash and 0.5842 of a share of AirTran common stock for each Midwest share. The total equity value of the exchange offer is $389 million.

65. AirTran's most recent offer "represents a premium of 83 percent over the 30 - day average closing price of Midwest common stock prior to when AirTran made its initial proposal . . . [and] represents an approximately 65 percent premium over the closing price of Midwest stock on December 12, 2006, the day before AirTran disclosed its initial October 20, 2006, offer." AirTran also extended the expiration date of the offer to May 16, 2007.

66. AirTran's CEO stated the following: "We firmly believe in the underlying value and benefits of combining these companies, and we are committed to bringing together these two airlines to create a truly national airline well-positioned for success in an increasingly competitive environment . . . That is why we are substantially increasing our offer despite the already attractive premium we have proposed, and without any benefit from additional financial information from Midwest, which has steadfastly refused to discuss the transaction with us and to explore the benefits of this merger. We believe it to be indisputable that this revised proposal represents a very full and generous offer, and it is our hope that Midwest's management and

board will join with those stakeholders who have asked that we consider increasing our offer and continue in our efforts to effect a transaction."

67.     Pursuant to SEC regulations, Midwest stated that it would "review and consider AirTran's offer and make a recommendation to shareholders no later than April 13."

68.     On April 9, 2007, AirTran CEO Leonard sent a letter to Midwest's Board describing numerous positive aspects of AirTran's latest exchange offer, and raising concerns with respect to Midwest's response to AirTran's exchange offer.  Specifically, Mr. Leonard's letter stated the following:

a.      "We want to take this opportunity to make clear to you and to the communities and customers served by Midwest [. . .] AirTran's firm commitment to offer the flight schedules and fare levels that we have discussed publicly which in turn will create the numbers of jobs that we have identified and the added value of our operations to suppliers and vendors that support your existing and our proposed expanded operations."

b.      "[I]t appears that the only third party that has evaluated Midwest's business plan are the employees of your most senior director who reported their findings to him in his capacity as Chairman of your Board Affairs and Governance Committee. The appearance of conflict, self-interest and bad faith presented by these facts, which has drawn critical comment from corporate governance experts, would not appear to support the use of that report in the exercise of your business judgment in determining the Company's future value as an independent entity or the effect of a transaction on the various constituencies. Since you have stated in your SEC filed documents that your financial advisor, Goldman, Sachs & Co. was retained to provide advice on resisting a merger with a financial incentive tied to your remaining

independent, clearly even if it had opined on future value or effect on constituencies, its advice on its face is biased."

        c.     "By 2009 we are committed to growing Milwaukee to 215 daily departures – a 34% increase over Midwest's existing operations to a total of 70 destinations."

        d.     "We anticipate creating more than 1,100 new jobs with career advancement opportunities for current employees as a result of the increased size of the combined companies. We plan to expand the Milwaukee training facilities, call center and aircraft maintenance operations and add a new marketing services center. We are committed to maintaining jobs for all current Midwest employees except officers and some headquarters positions; our proposal by any measure will result in a net increase in jobs."

        e.     "We expect to be fully engaged in the communities that Midwest presently serves and to play an active role in charitable and civic affairs."

## CAUSE OF ACTION AGAINST ALL DEFENDANTS

        69.     Defendants' failure to properly consider and act upon AirTran's numerous proposals simply evidences their disregard for the premium being offered to Midwest shareholders. By failing to properly pursue these offers, defendants are depriving plaintiff and the Class of the right to receive the maximum value for their shares. In addition, defendants' refusal to negotiate with AirTran improperly deprives the citizens of Milwaukee and its surrounding community of the benefits of increased services and lower prices associated with the pending exchange offer.

        70.     Defendants' rejection of AirTran's offer will ensure their continued positions within the Company but deprive the Company's public shareholders of the premium that AirTran is prepared to pay, or of the enhanced premium that direct negotiation could provide.

71.    Defendants owe fundamental fiduciary duties to Midwest stockholders to take all necessary and appropriate steps to maximize the value of their shares.  In addition, the Director Defendants have the responsibility to act independently so that the interests of the Company's public stockholders will be protected and to consider properly all *bona fide* offers for the Company. Furthermore, the directors of Midwest must adequately ensure that no conflict of interest exists between the Director Defendants' own interests and their fiduciary obligations to maximize stockholder value or, if such conflicts exist, to insure that all such conflicts will be resolved in the best interests of the Company's stockholders.

72.    Because the defendants dominate and control the business and corporate affairs of Midwest and because they are in possession of private corporate information concerning Midwest's assets, businesses and future prospects, there exists an imbalance and disparity of knowledge of economic power between defendants and the public stockholders of Midwest.  This discrepancy makes it grossly and inherently unfair for defendants to entrench themselves at the expense of Midwest's stockholders.

73.    The Director Defendants have breached their fiduciary and other common law duties owed to plaintiff and other members of the Class in that they have not and are not exercising independent business judgment and have acted and are acting to the detriment of the Class.

74.    Plaintiff seeks preliminary and permanent injunctive relief and declaratory relief preventing defendants from inequitably and unlawfully depriving plaintiff and the Class of their rights to realize a full and fair value for their stock at a premium over the market price, by unlawfully entrenching themselves in their positions of control, and to compel defendants to carry out their fiduciary duties to maximize shareholder value.

75.     Only through the exercise of this Court's equitable powers can plaintiff be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

76.     Unless enjoined by the Court, defendants will continue to breach their fiduciary duties owed to plaintiff and the members of the Class, and/or aid and abet and participate in such breaches of duty, and will prevent the sale of Midwest at a substantial premium, all to the irreparable harm of plaintiff and other members of the Class.

77.     By reason of the foregoing acts, practices and course of conduct, the Director Defendants have failed to use the required care and diligence in the exercise of their fiduciary obligations owed to Midwest and its public shareholders.

78.     As a result of the actions of the defendants, plaintiff and the Class have been and will be damaged in that they will not receive the fair value of Midwest's assets and business in exchange for their Midwest shares, and have been and will be prevented from obtaining a fair price for their shares of Midwest common stock.

79.     Plaintiff has no adequate remedy at law.

## COUNT I

**Class Claim Against All Defendants for Breach of Fiduciary Duties**

80.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

81.     Defendants have knowingly and recklessly acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

/465412

82.     Defendants have knowingly or recklessly and in bad faith violated the fiduciary duties of care, loyalty, good faith, candor and independence owed to the public shareholders of Midwest and have acted to put their personal interest ahead of the interests of Midwest's shareholders.

83.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, knowingly or recklessly and in bad faith are attempting to unfairly deprive plaintiff and other members of the Class of the true value of their investment in Midwest.

84.     Defendants have knowingly or recklessly and in bad faith violated their fiduciary duties by repeatedly declining the opportunity to enter into negotiations regarding a transaction with AirTran without regard to the fairness of the transaction to Midwest or its shareholders and by failing to disclose all material information concerning AirTran's proposed exchange offer to such shareholders.

85.     Defendants have taken certain actions that are unreasonable in relation to AirTran's repeated attempts to engage Midwest in a discussion regarding the pending exchange offer.

86.     As demonstrated by the allegations above, the defendants knowingly or recklessly failed to exercise the care required and breached their duties of loyalty, good faith, candor and independence owed to Midwest and the Class because, among other reasons:

a.     They failed to take steps to maximize the value of Midwest to its public shareholders and they took steps to preclude any negotiations with AirTran;

b.     They ignored or did not protect against the numerous conflicts of interest resulting from the defendant Treitel's position with SH&E;

c.     They failed to disclose all material information that would permit Midwest's stockholders to cast a fully informed vote on AirTran's proposed exchange offer; and

d.     They unreasonably failed to invalidate or otherwise make inapplicable Midwest's Rights Plan.

87.     Because the Director Defendants dominate and control the business and corporate affairs of Midwest, and are in possession of private corporate information concerning Midwest's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Midwest which makes it inherently unfair for them to preclude any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

88.     By reason of the foregoing acts, practices and course of conduct, the Director Defendants have knowingly or recklessly and in bad faith failed to exercise care and diligence in the exercise of their fiduciary obligations toward plaintiff and the other members of the Class.

89.     Unless enjoined by this Court, the Director Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to Midwest and the Class.

90.     The Director Defendants are engaging in self dealing, are not acting in good faith toward plaintiff and the other members of the Class, and knowingly or recklessly have breached and are continuing to breach their fiduciary duties to the members of the Class.

91.     Unless the Director Defendants' threatened use of the Rights Plan is enjoined by the Court, the Director Defendants will continue to knowingly or recklessly and in bad faith breach their fiduciary duties owed to Midwest and the members of the Class.

/465412

92. As a result of the defendants' misconduct, Midwest and the Class will be harmed because unless enjoined, defendants will be permitted to preclude the exploration of a combination of AirTran and Midwest in an effort to aggrandize their own financial position and interests at the expense of and to the detriment of Midwest and the Class. Absent the false and misleading statements disseminated by Midwest, the majority of the shareholders who are unaware of untruths (and will rely thereon) would not vote for AirTran's proposed exchange offer. As such, the Class will be harmed directly and proximately by the defendants' wrongful conduct.

93. Plaintiff and the members of the Class have an inadequate remedy at law. Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which the Director Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A. Declaring that this action may be maintained as a class action;

B. Declaring and decreeing that the refusal to negotiate with AirTran is a breach of the fiduciary duties of the Director Defendants and is therefore unlawful;

C. Enjoining defendants from proceeding with enforcement of its Rights Plan;

D. Requiring the Director Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of shareholders until the process for any combination of the Company with AirTran is completed and highest possible price is obtained;

E.     Requiring defendants to compensate plaintiff and the members of the Class for all losses and damages suffered and to be suffered by them as a result of the acts and transactions complained of herein, together with prejudgment and post judgment interest;

F.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

G.     Granting such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated this 12th day of April, 2007.


                            /s/ ChristopherJ. Ahrens
                            Christopher J. Ahrens
                            Bar Number:   1043237
                            Attorney for Plaintiff
                            PREVIANT, GOLDBERG, UELMEN,
                            GRATZ, MILLER & BRUEGGEMAN, S.C.
                            1555 N. RiverCenter Drive, S. 202
                            P. O. Box 12993
                            Milwaukee, WI   53212
                            Telephone: 414/271-4500
                            Fax: 414/271-6308
                            E-Mail: cja@previant.com


**Of Counsel**:

**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
Gregory M. Nespole
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

27

**LAW OFFICES OF MARC S. HENZEL**
Marc S. Henzel
273 Montgomery Ave
Suite 202
Bala Cynwyd, PA 19004
Telephone: (610) 660-8000

**ABBEY SPANIER RODD ABRAMS & PARADIS, LLP**
Jill S. Abrams
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700

**Attorneys for Plaintiff**